IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ELZE T. MEIJER and MARCEL WINDT, )
solely in their capacity as )
Trustees in Bankruptcy for )
KPNQwest, N.V., a Dutch )
corporation, and Global )  1:08cv673 (LMB/TRJ)
Telesystems Europe Holdings, B.V., )
a Dutch corporation, )
 )
    Plaintiffs, )
 )
v. )
 )
H. BRIAN THOMPSON )
 )
    Defendant. )

## MEMORANDUM OPINION

Plaintiffs Elze T. Meijer and Marcel Windt, in their
capacity as bankruptcy trustees, have brought this action against
defendant H. Brian Thompson, seeking collection of a promissory
note.  Before the Court are the parties' cross-motions for
summary judgment and the plaintiffs' motion to dismiss the
defendant's indemnity counterclaim and corresponding defenses.
For the reasons discussed below, plaintiffs' motions will be
granted, defendant's motion will be denied, and judgment will be
entered in the plaintiffs' favor.

### I. Background

**A. The Note.**

On April 1, 1999, defendant H. Brian Thompson ("Thompson"),
a resident of Alexandria, Virginia, entered into a contract
("Employment Agreement") to serve as Chairman and CEO of Global

TeleSystems Group, Inc. ("GTS"). As part of the Employment Agreement, Thompson agreed to enter into a separate contract to purchase $20 million of stock in GTS. Thompson paid half of the $20 million to GTS in cash. The other half of the stock purchase was covered by a full recourse[1] promissory note ("Note") in the amount of $10 million from Thompson to GTS. Thompson executed the Note on April 6, 1999. It was secured by the shares Thompson purchased with the loan proceeds. Note ¶ 7. Thompson never actually received the shares of stock, which were held as security pending his repayment of the loan.

The Note required that the principal, together with all accrued and unpaid interest, be paid on the "Termination Date," defined as the <u>earliest</u> of (1) Thompson's "Date of Termination" from GTS,[2] (2) the occurrence of certain acceleration conditions,[3] or (3) six years from the date the Note was executed, <u>i.e.</u>, April 6, 2005. <u>Id.</u> ¶ 1. The Note is governed by

---

[1]The Employment Agreement described the Note as "full recourse," Emp. Agr. § 5(d)(ii), and the Note itself contains no restrictions on GTS's ability to collect when payment is due. Thompson also testified that he understood that the Note was full recourse. Thompson Dep. 75:11-13, 80:13-20.

[2]"Date of Termination" is defined as the date of Thompson's actual termination. Emp. Agr. ¶ 1(m). "Termination Date" refers to the earliest of three possible maturity dates for the Note, one of which is the "Date of Termination." Note ¶ 1.

[3]These conditions included, among others, Thompson's failure to make an interest payment, followed by failure to cure such lack of payment within 5 business days of written notice. Note ¶ 3(a).

Virginia law. Id. ¶ 20. The Note also mandated that no waiver or modification of the Note would be valid or binding "unless set forth in a writing specifically referring to this Note and signed by a duly authorized officer of [GTS], and then only to the extent specifically set forth therein." Id. ¶ 12.

**B. The General Release and Severance Agreement.**

Both Thompson and GTS anticipated that the value of GTS's stock would increase in value. However, throughout the year 2000, GTS's stock plummeted. In the fall of 2000, GTS decided to terminate Thompson. On September 18, 2000, Thompson and GTS entered into an agreement ("Preliminary Agreement") under which his employment was terminated immediately. On December 4, 2000, Thompson and GTS entered into a General Release and Severance Agreement ("Severance Agreement"), which "supercede[d] all prior agreements between the Parties with respect to the subject matter," except for certain matters regarding stock options not relevant to this litigation. Sev. Agr. ¶ 10. The Severance Agreement, which is governed by Delaware law, id. ¶ 24, terminated Thompson's employment, effective September 18, 2000, id. ¶ 1.

A number of provisions of the Severance Agreement are relevant to this case. These include Paragraph 5, ("Repayment of Loan Secured by Stock"), which specifically mandated

> [t]hat certain Promissory Note made April 6, 1999 and
> payable to the order of the Company by [Thompson] . . .

-3-

> shall continue to be enforceable in all respects in
> accordance with its terms except that [GTS] agrees to
> (a) waive any provision of such Note that requires
> [Thompson] to repay such Note solely by virtue and at
> the time of his termination of employment with [GTS]
> hereunder and (b) postpone the due date of the interest
> payment otherwise due on April 6, 2000 until December
> 1, 2000[,]

and Paragraph 9 ("Release of Claims by the Company"), which

released Thompson from

> any and all claims, debts, demands, accounts,
> judgments, rights, causes of action, equitable relief,
> damages, costs, charges, complaints, obligations,
> promises, agreements, controversies, suits, expenses,
> compensation, responsibility and liability of every
> kind and character whatsoever . . . which [GTS] has or
> may have had against [Thompson] . . including without
> limitation any and all claims arising out of
> [Thompson's] employment with [GTS] or the termination
> thereof provided, or with respect to [Thompson's]
> status at any time as a holder of any securities of
> [GTS].

This release bound GTS and any of its past, present, or future

entities. Id. ¶ 9. Paragraph 9 specifically excluded from the

above release only two types of claims: claims relating to or

arising from criminal activity by Thompson, and "any obligation

assumed under this Agreement by any Party hereto." Id.

Under Paragraphs 6 and 7, Thompson agreed to provide

services to GTS pursuant to two separate incorporated agreements,

a "Consulting Agreement" and an "Investment Banking Agreement."

Under the Consulting Agreement, Thompson agreed to provide

certain consulting services to GTS, which agreed to compensate

him in an amount equal to "the interest payments due under the

-4-

'Note' (as defined in the [Severance Agreement])" until April 6, 2005.  Cons. Agr. ¶ 3.  Under the Investment Banking Agreement, the parties agreed that if GTS entered into a "strategic transaction," such as a sale, merger, buyout, or similar transaction, within two years of Thompson's termination, it would pay Thompson $3.5 million plus $300,000 for each dollar by which the per-share price of GTS's stock exceeded $12 at the time of the strategic transaction.  Inv. Bank. Agr. ¶¶ 3(a), 5.  Thompson's compensation from the Investment Banking Agreement would be applied "to reduce any balance of principal outstanding on the 'Note' (as defined in the Severance Agreement)" with any remainder to be paid in cash.  Id. ¶ 5.  Obviously, if the per-share price of GTS's stock were high enough, the balance of the Note could be reduced to nothing.

Lastly, Paragraph 20 of the Severance Agreement stated that there were "no representations, promises, or agreements between [GTS] and [Thompson] other than those expressly set forth herein," and that Thompson "had an adequate opportunity to consult with competent legal counsel of his choosing" while negotiating and executing the Severance Agreement.  Sev. Agr. ¶ 20.

### C. Bankruptcy of GTS and Acquisition of Note.

By November 2001, GTS was about to declare bankruptcy.  On November 11, 2001, GTS sold the Note and the right of repayment

to Global TeleSystems Europe Holdings N.V. ("GTS Holdings"), a
Dutch company, for $5.4 million.  All of the shares of GTS
Holdings were later acquired by KPNQwest N.V. ("KPNQwest"),
another Dutch company.  On November 14, 2001, GTS filed for
bankruptcy.  KPNQwest and GTS Holdings were declared bankrupt on
May 31, 2002 and August 2, 2002, respectively.  The plaintiffs,
Elze Meijer and Marcel Windt ("the Trustees"), were appointed as
bankruptcy trustees for KPNQwest and GTS Holdings.

On July 28, 2003, counsel for the Trustees sent a notice to
Thompson, informing him that because he had defaulted by failing
to pay any interest on the Note in 2000, 2001, and 2002, under
the Note's acceleration clause, he was required to pay the
principal and all accrued interest.  Thompson objected to the
demand on August 28, 2003 by a letter arguing that "the
predicates for . . . acceleration and demand have not been
satisfied [because] the claims of Mr. Thompson under the
Consulting Agreement and the [Investment Banking] Agreement
became an integral part of the Note . . . and have satisfied any
amounts accruing or due hereunder."  On May 7, 2008, the Trustees
sent Thompson a second notice of default.[4]

---

[4]After the initial exchange of letters in 2003, the Trustees
sent two follow-up letters on December 18, 2003 and February 19,
2004, and the parties had some limited conversations during that
time frame.  See Def.'s Mot. S.J. Exs. 42, 43.  The record is
silent as to any other communications until 2008.

On June 30, 2008, the Trustees filed this lawsuit[5] for
breach of promissory note, demanding damages of not less than
$6.5 million, plus interest and attorneys' fees.[6] The Trustees
have since conceded that they are owed at most $6.5 million in
principal, and that they are not entitled to any interest before
the Note's due date, April 6, 2005.[7] See Pl.'s Mem. S.J. 30.
Thompson filed a Motion to Dismiss for Failure to State a Claim,
which was denied (Dkt. No. 21), and a motion to add a
counterclaim and defense for indemnity, which was granted (Dkt
No. 40). Both parties have now moved for summary judgment on
whether Thompson is liable under the Note, and the Trustees have
moved to dismiss Thompson's indemnity counterclaim and defense.

## II. Cross-Motions for Summary Judgment.

### A. Standard of Review.

Summary judgment is appropriate when, on the basis of the

---

[5]The matter is in federal court under diversity
jurisdiction, as the amount in controversy well exceeds $75,000,
and the plaintiffs, Dutch citizens, are diverse from the
defendant, a citizen of Virginia.

[6]The Note requires Thompson to pay all collection costs,
including reasonable attorney's fees, if he "fails to pay any
amounts . . . when due." Note ¶ 8.

[7]The Trustees concluded that the sale of GTS in bankruptcy
qualified as a "strategic transaction" that resulted in the
reduction of the principal owed on the Note by the minimum amount
specified in the Investment Banking Agreement, $3.5 million. See
Pls.' Mem. S.J. 3. They also concluded that Thompson satisfied
his obligations under the Consulting Agreement, which entitled
him to payments equivalent to any interest on the Note until it
became due. See id. n. 2.

pleadings and evidence, there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Evidence must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The party opposing summary judgment may not rely on mere allegations or denials in its pleadings.  Fed. R. Civ. P. 56(e).  Rather, the nonmoving party must, "by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324.  Evidence that is "merely colorable" or "not significantly probative" is insufficient to overcome a summary judgment motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

**B. Discussion.**

The Note at issue obligates Thompson to pay the principal upon the Termination Date, which has indisputably passed.  The only issues, therefore, are whether any of Thompson's defenses to payment have merit.

Thompson has argued, alternatively, that the Note is time-barred, that the Severance Agreement released him from any personal obligation to repay the Note, that the Note is void for a failure of consideration, and that the Trustees cannot enforce

-8-

the Note because they materially breached their own obligations. All of these arguments are affirmative defenses. See Def.'s Am. Answer 5-8; see also Fed. R. Civ. P. 8(c)(1) (listing statute of limitations, release, and failure of consideration as affirmative defenses); Centex Constr. v. Acstar Ins. Co., 448 F. Supp. 2d 697, 715-16 (E.D. Va. 2006) (describing material breach as an affirmative defense). Accordingly, Thompson bears the burden to prove them. See Monahan v. Obici Med. Mgm't Servs., 628 S.E.2d 330, 336 (Va. 2006). For the reasons discussed below, the Court finds that Thompson has failed to meet that burden for any affirmative defense, and that the Note remains a valid obligation, enforceable against Thompson. Accordingly, summary judgment will be granted to the Trustees.

### 1. Rule of Construction.

The parties agree that the two key documents underlying this dispute are the Note and the Severance Agreement. Thompson argues that the Court should construe any ambiguities in the Severance Agreement in his favor pursuant to the canon of contra proferentem, under which ambiguous contractual terms are construed against the drafter. Maersk Line, Ltd. v. United States, 513 F.3d 418, 423 (4th Cir. 2008).

The Trustees correctly argue that the rule of contra proferentem is inapplicable here. When an agreement is negotiated and drafted by both parties, this rule does not apply.

-9-

*See* *Silicon Image, Inc. v. Genesis Microchip, Inc.*, 271 F. Supp.
2d 840, 850 (E.D. Va. 2003).  Although the evidence in the record
indicates that GTS's lawyers were responsible for drafting the
Severance Agreement and integrating any mutually agreed-upon
modifications, it also shows that Thompson and his counsel, Alvin
Brown, the head of the Executive Compensation Department at
Simpson Thacher & Bartlett LLP, were involved in revising the
drafts and negotiating changes over three months, starting from
Thompson's termination in September 2000 until the Severance
Agreement was finalized in December.  *See* Brown Dep. 39:24-40:25.
During this period, the parties exchanged at least seven drafts,
and numerous changes were proposed and made to GTS's proposed
language.  *See* *id.*  Finally, in signing the Severance Agreement,
Thompson expressly represented that he "had an adequate
opportunity to consult with competent legal counsel of his
choosing."  Sev. Agr. ¶ 20.

In short, Thompson was an experienced businessman,
represented by an experienced lawyer.  He "[did] not suffer from
lack of legal sophistication or a relative lack of bargaining
power, and . . . it is clear that [the Severance Agreement] was
actually negotiated and jointly drafted."  *AIU Ins. Co. v.
Superior Court*, 799 P.2d 1253, 1265 (Cal. 1990).  Accordingly,
the Court "need not go so far in protecting [Thompson] from
ambiguous or highly technical drafting."  *Id.*  Thompson cannot

-10-

claim shelter in the protection of a rule designed to protect an unsuspecting party who plays little or no role in the drafting of a contract.

### 2. Statute of Limitations.

Although Thompson has argued that the Note is unenforceable because it is time-barred, the Court finds that the Note did not mature until April 6, 2005, and accordingly is not time-barred, regardless of whether it is characterized as a negotiable instrument or as a written contract.

### i. Governing Statute of Limitations.

The Note is subject to one of two possible statutes of limitation. If it is a negotiable instrument, as argued by the Trustees, the statute of limitations runs for six years from the due date. See Va. Code Ann. § 8.3A-118(a). If it is not a negotiable instrument, as Thompson asserts, it is subject to the five year statute of limitations for written contracts, which begins to run when the cause of action accrues. See Va. Code Ann. § 8.01-246(2). The complaint in this action was filed on June 30, 2008. Thus, for the Note to survive a statute of limitations defense, it must have been due no earlier than June 30, 2003 if it is a contract, and no earlier than June 30, 2002 if it is a negotiable instrument. Thompson argues that the Note matured in 2000, when he was terminated. Under that position, the Trustees' action would be time-barred under either statute of

-11-

limitations.  The Trustees argue that the Note became due on April 6, 2005, which would place the filing of this complaint well within either limitations period.

### ii. Contract Language.

The Note specified that it was due on the earliest of three alternative dates: (1) the date of Thompson's termination from GTS; (2) the occurrence of an acceleration condition; or (3) April 6, 2005.  Note ¶ 1.  Thompson's effective date of termination was September 18, 2000.  If the Note had matured on that date, this complaint would now be time-barred.  However, under Paragraph 5 of the Severance Agreement, "[GTS] agree[d] to waive any provision of such Note that requires [Thompson] to repay such Note solely by virtue and at the time of his termination of employment with [GTS]."

The parties dispute the effect of Paragraph 5.  The Trustees argue that it modified the Note such that it was no longer due on the date of Thompson's termination, _i.e._, it eliminated the first of the three alternative dates of the Note's maturity.  Conversely, Thompson argues that under Paragraph 5, GTS only "waive[d]" its right to collect payment on the date of Thompson's termination, but did not actually amend the maturity date, meaning that the Note matured, and the statute of limitations began running, on September 18, 2000.

The Trustees' argument is persuasive.  Notwithstanding the

-12-

word "waive," Paragraph 5 modified the Note.  A waiver of a right

to payment under a note is distinguishable from a modification or

amendment of that note in that a waiver is a unilateral act, does

not require consideration, and can be withdrawn at the waiving

party's pleasure, whereas a modification is a bilateral act,

requires consideration, and is binding.  See David V. Snyder, The

Law of Contract and the Concept of Change: Public and Private

Attempts to Regulate Modification, Waiver, and Estoppel, 1999

Wis. L. Rev. 607, 626-27 (1999).  Paragraph 5 was part of a

bilateral contract signed by both parties, each of whom undertook

numerous obligations as consideration.  Accordingly, GTS was not

free to withdraw the "waiver" at any time; rather, it was a

binding modification to the Note, and not a unilateral act by

GTS.

Thompson's position relies primarily on the use of the word

"waive," arguing that when a term has a definite legal

significance, it is to be construed according to that meaning.

See Smith v. Smith, 423 S.E.2d 851, 853 (Va. Ct. App. 1992)

(citing Nye v. Lovitt, 24 S.E. 345, 346 (Va. 1896).  However,

this argument ignores the factors identified above that clearly

indicate that this was not a waiver, but a modification.

Thompson's reliance on Carter v. Noland, 10 S.E. 605 (Va.

1890), is misplaced.  In Carter, which has been cited in Virginia

courts only once,[8] the payee of a bond that was payable on demand, and had already been partially collected, endorsed the bond with a promise not to demand any further payment until a certain marble quarry was operating successfully. The Virginia Supreme Court held that this did not "change or alter the period for the maturity of the bond," but merely provided the payor with a defense of waiver. Carter, 10 S.E. at 605-06.

Carter is distinguishable. The bond at issue in Carter was payable on demand, id. at 605, and therefore became due immediately. In addition, the endorsement was a unilateral promise, signed only by the payee. Accordingly, the court held that the payee's promise, necessarily made after the bond had matured, was merely "an engagement on the part of the obligee to postpone or defer the exercise of a right already accrued," and did not change the bond's maturity date. Id. at 605. The Note Thompson signed had not matured because when Thompson was terminated on September 18, 2000, the parties entered into a bilateral Preliminary Agreement, under which GTS agreed to "waive[] right to repayment of $10M note on Date of Termination." Three months later, under the Severance Agreement (which superseded the Preliminary Agreement), GTS, in exchange for consideration, again agreed to postpone the Note's due date. At

---

[8]See Nottingham v. Ackiss, 57 S.E. 592, 593 (Va. 1907) (citing, and distinguishing, Carter).

-14-

no time had GTS's right to repayment ever "accrued." Moreover, the Severance Agreement was a binding obligation on both parties, not a mere promise by GTS. Finally, the holding in <u>Carter</u> concerned the plaintiff's pleading requirements; it did not address, in any way, the running of a statute of limitations. For all of the above reasons, <u>Carter</u> is not dispositive of the case at bar.

Finally, Thompson argues, citing <u>Union Cent. Life Ins. Co. v. Wilson</u>, 161 S.E. 237, 239 (Va. 1931), that the Severance Agreement does not manifest a "clear and distinct" waiver of a statute of limitations defense. This argument misses the point. Under Paragraph 5, GTS, which otherwise would have been entitled to demand immediate payment of the Note due to Thompson's termination, agreed to postpone the due date. Obviously, the running of the statute of limitations was postponed as well. It was not necessary for the parties to make a second explicit agreement under which Thompson would waive a statute of limitations defense, because he had no such defense available to him until the Note itself would mature.

### iii. Extrinsic Evidence.

Although the Court has found that the plain language of Paragraph 5 establishes that GTS did not waive its right to enforce the Note, the Court has also considered Thompson's arguments based on extrinsic evidence.

-15-

Citing a draft term sheet that included language stating
that GTS "[w]aives right to Termination Date repayment of $10M
note (i.e. note due in 6 years as per its terms)," Def.'s Mot.
S.J. Ex. 14, Thompson argues that the rejection of this language
is evidence that the final Severance Agreement did not modify the
Note's due date.  This argument is entirely speculative because
there is absolutely no evidence that the choice of the final
language in the Severance Agreement reflected a substantive
rejection of the proposed draft language.

In fact, the only evidence is to the contrary.  GTS's former
General Counsel, Grier Raclin, who was involved in drafting and
negotiating Thompson's Severance Agreement, testified simply that
his co-counsel "didn't think that change [i.e., using the
proposed draft language] was necessary."  Raclin Dep.
99:17-100:5.  The draft language can just as easily be
interpreted as evidence that the final version of Paragraph 5 was
intended to embody the statement in the draft that the Note would
be "due in 6 years as per its terms."  This latter interpretation
is supported by Raclin's express testimony that the intent of the
language was to modify the Note's maturity date, and that the
word "waive" was used to be concise and to eliminate the need to
reissue the Note.  See id. 167:23-68:10 ("It was just easier to
do it in a paragraph here rather than issue a new note . . .
waiving it accomplished the same thing . . . with a phrase rather

-16-

than a paragraph that goes into paragraph X, Y, Z of the note is hereby replaced and restated with the following or whatever."). In contrast, there is absolutely no testimony from either Thompson or his attorney regarding their understanding as to the intent or meaning of the term "waive" at the time the Severance Agreement was signed.[9]

Thompson also argues that the Severance Agreement did not modify the Note because the Note was never formally revised and restated. However, the Note expressly provided for modification by "a writing specifically referring to this Note," Note ¶ 12, and Paragraph 5 of the Severance Agreement clearly satisfies this requirement. Accordingly, no formal revision of the Note was necessary.

In short, even if the "waive" language in the Severance Agreement were ambiguous, Thompson has provided no evidence to support his argument that the Severance Agreement did not alter the Note's maturity date. On the other hand, the extrinsic evidence fully supports the Trustees' position. Accordingly, the

---

[9]Thompson has testified only that it is his <u>current</u> belief that the Note is time-barred. Thompson Dep. 206:20-22. This testimony is irrelevant; the only relevant issue is the parties' intent when the Severance Agreement was signed. Indeed, given Thompson's extensive testimony regarding his contemporaneous understanding of other aspects of the Note and Severance Agreement, discussed <u>infra</u>, the lack of such testimony regarding the "waiver" provision further indicates that neither party intended for this provision to have the strained meaning that Thompson now advocates.

-17-

Court rejects Thompson's argument that the statute of limitations on the Note began to run on September 18, 2000. Rather, the evidence shows that it began to run on April 6, 2005, when the Note matured on the last of the three original alternative due dates.[10]  Because the Trustees filed their complaint on June 30, 2008, a little over three years later, the action is not barred by either of the two possible statutes of limitations.

### 3.   Thompson's Personal Obligation to Repay the Note.

Thompson has raised an affirmative defense of release, arguing that even if the Note is not time-barred, the Severance Agreement released him from any personal obligation to repay the Note, effectively converting his debt from a full-recourse to a non-recourse obligation.  This argument is unsupported, either by the contract language or the extrinsic evidence.

### i. Contract Language.

Paragraphs 5, 6, and 7 of the Severance Agreement control this issue.  Paragraph 5 states that the Note "shall continue to be enforceable in all respects in accordance with its terms except" for the "waiver" of Thompson's requirement to repay the Note on the date of his termination, discussed supra, and the postponement of the date of one interest payment from April 6, 2000 until December 1, 2000.  Paragraphs 6 and 7 incorporate the

---

[10]Both parties agree that the Note did not become due based on the second alternative, the occurrence of an acceleration condition.

Consulting and Investment Banking Agreements, which impose

certain obligations on Thompson and tie his compensation directly

to "the interest payments due under the 'Note' and "any balance

of principal outstanding on the 'Note.'"  The clear import of

these three paragraphs is that the Note would remain "enforceable

in all respects" with only the two exceptions described in

Paragraph 5, and that Thompson, if he complied with the terms of

the Consulting Agreement and the Investment Banking Agreement,

would be entitled to certain offsets to the principal and

interest.

Thompson argues that the Note is no longer enforceable

against him personally as a result of the releases in Paragraph

9, which provides a general release of GTS's claims against

Thompson for all

> claims, debts, demands, accounts, judgments, rights,
> causes of action, equitable relief, damages, costs,
> charges, complaints, obligations, promises, agreements,
> controversies, suits, expenses, compensation,
> responsibility and liability of every kind and
> character whatsoever . . . including without limitation
> any and all claims . . . with respect to [Thompson's]
> status at any time as a holder of any securities of
> [GTS].

Sev. Agr. ¶ 9.  It excludes from the release two specific

categories: claims related to criminal activity by Thompson and

"any obligation assumed under this Agreement by any Party

hereto."  Id.

Thompson argues that the release encompassed his personal

-19-

obligation under the Note because the Note was a debt "with
respect to [Thompson's] status . . . as a holder of any
securities of [GTS]," and it was a preexisting obligation that
was not "assumed" under the Severance Agreement and therefore was
not excluded from the general release.  In sum, Thompson argues
that when Paragraphs 5, 6, 7, and 9 are read together, they
release him from any personal obligation to pay the Note, which
remained enforceable only against the shares of GTS stock pledged
as security and his obligations under the Consulting and
Investment Banking Agreements.  Thompson also maintains that the
incorporation of the Consulting and Investment Banking Agreements
into the Severance Agreement establishes that these agreements
replaced his personal obligation to repay the Note.

Thompson's reading of the Severance Agreement is
unreasonable.  First, it is a basic canon of contract law that
specific language is given greater weight than general
provisions.  See Burgin v. Office of Pers. Mgmt., 120 F.3d 494,
498 (4th Cir. 1997).  Paragraph 5 explicitly addresses the Note,
affirming that it would "continue to be enforceable in all
respects" but two, neither of which removes Thompson's personal
obligation to pay.  Paragraphs 6 and 7 incorporate the Consulting
and Investment Banking Agreements, which explicitly tie
Thompson's compensation to payments due on the Note.  Paragraph
9, conversely, is a general release that contains no explicit

-20-

reference to the Note.  Paragraphs 5, 6, and 7 therefore control over the general language in Paragraph 9, which would effectively nullify these provisions if it released Thompson from the Note completely.  See O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 287 (Del. 2001) ("Contracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'").

Second, the Note cannot be modified by a general release.  The Note provides that "[n]o waiver or modification of any of the terms of this Note shall be valid or binding unless set forth in a writing specifically referring to this Note . . . and then only to the extent specifically set forth therein."  Note ¶ 12.  This language makes clear that the Note cannot be modified, such as by conversion from full recourse to non-recourse, unless done explicitly.  Paragraph 5 meets this requirement by specifically referencing the Note.  Paragraph 9, on the other hand, does not mention the Note.[11]

Third, Thompson's debt under the Note was excluded from the release in Paragraph 9 because it was an "obligation[] assumed

---

[11]Thompson's argument that Paragraph 9 specifically references the Note by releasing Thompson from any claims "with respect to [Thompson's] status . . . as a holder of any securities of [GTS]" is unpersuasive.  Given the Severance Agreement's clear references to the Note in Paragraph 5, had the parties intended to reference the Note in Paragraph 9, they could have done so explicitly.  Moreover, the Note itself, although it was incurred so that Thompson could purchase stock in GTS, was not an obligation "with respect to [Thompson's] status . . . as a holder of any securities of [GTS];" it was a personal obligation to pay $10 million.

under [the Severance] Agreement." Although the Note pre-dated
the Severance Agreement, Paragraph 5 of the Severance Agreement
explicitly reaffirmed the Note and modified its conditions. It
was accordingly excepted from the general release in Paragraph 9.

Thompson's assertion that his obligations under the
Consulting and Investment Banking Agreements replaced his
personal liability on the Note is meritless. Nothing in those
agreements suggests that Thompson's personal obligations were
released. To the contrary, they show that his obligations
remained. Had Thompson been released from personal liability,
there would have been no reason to expressly link his
compensation under the Consulting and Investment Banking
Agreements to the remaining payments due on the Note. Rather,
the Note's continued enforceability served both as a meaningful
guarantee that Thompson would perform his obligations under these
agreements, and in the case of the Investment Banking Agreement,
as an incentive for him to find a buyer for GTS. Moreover,
Thompson's new duties under these agreements did not replace his
liability on the Note in a financial sense, because his
compensation under the agreements was not identical to his
obligations under the Note. His compensation from the Consulting
Agreement mirrored the Note's interest payments only until April
6, 2005, the Note's new due date, but not beyond. His
compensation from the Investment Banking Agreement was not the

-22-

Note's entire principal, but only $3.5 million plus $300,000 for each dollar by which the sale price of GTS's shares would exceed $12, and only if GTS was sold within two years.  Under the right circumstances, had GTS been sold within two years for a high enough price, rather than the bankruptcy that actually occurred, Thompson's obligations under the Note could have been completely satisfied as a result of the Severance Agreement.  But the Severance Agreement certainly did not guarantee that outcome.

Finally, the phrase "non-recourse" appears nowhere in the Severance Agreement.  If the parties had truly intended to cancel Thompson's personal liability on what was unambiguously a full recourse note, they could have done so with a few simple words, but they did not.

Accordingly, the Court finds that the text of the Severance Agreement left the Note fully enforceable against Thompson.  It provided Thompson with a postponement of the due date and a means of earning off all pre-default interest and a considerable amount of principal.  It did not convert the Note into a non-recourse obligation.

### ii. Extrinsic Evidence.

This interpretation of the plain meaning of the Note and Severance Agreement is consistent with the extrinsic evidence developed in the case.

#### a. Prior Versions and Negotiations of the Severance Agreement.

-23-

Both parties have cited to prior drafts and revisions of the Severance Agreement to support their interpretations of the agreement.  None of this evidence is probative of the meaning of the final Severance Agreement because there is simply no evidence in the record as to why specific revisions were, or were not, made.[12]

Thompson has also argued that because he believed that he was not required to repay the Note at all, he would not have agreed to any severance agreement that would have left him with such an obligation.  The evidence, however, belies this argument.

As Thompson and GTS negotiated the outlines of a severance agreement, Thompson maintained that he did not have to repay the Note, which was to become immediately due upon his termination. Rather, he told Raclin that when he negotiated and signed the original Employment Agreement and Note in 1999, one of GTS's board members, Adam Solomon, had told him that he would not have to repay the Note if the value of GTS's stock declined.

---

[12]This conclusion applies with considerable force to Thompson's assertions regarding the phrase in Paragraph 9, "[claims] with respect to the Executive's status at any time as a holder of any securities of the Company."  Citing evidence that this phrase was added to the release shortly before the agreement was executed, Thompson argues that this shows that the phrase refers to the Note, which was a contentious issue during the negotiations.  See Def.'s Mem. S.J. 8.  Such a conclusion is purely speculative and cannot overcome the much simpler point that had the parties meant to include the Note in the release, they could have done so explicitly as they did in Paragraph 5.

According to Raclin, Solomon adamantly denied Thompson's contention, see Raclin Dep. 88:20-23,[13] and Robert Amman, a GTS board member who later succeeded Thompson as CEO, testified that Solomon would have lacked the authority to make such a representation.  See Amman Dep. 43:2-43:11.

Regardless of whether Solomon made such a representation in 1999, Thompson maintained in 2000 that he was not required to repay the Note.  See Pl.'s Mot. S.J. Ex. 7 ("Brian thinks that was the deal [that he would not have to repay the loan if the stock price declined] and Adam [Solomon] says it wasn't.").  Conversely, GTS's position was that Thompson was required to pay the Note in full.

Thompson claims that because he adamantly opposed repaying the Note, he never would have agreed to a resolution under which he was still personally liable.  He has cited extrinsic evidence of his negotiating position, particularly contemporaneous, handwritten notes by GTS's counsel, stating that Thompson wanted the Note to be forgiven, including one note stating that Thompson "won't move more" on the subject.  See Def.'s Mot. S.J. Ex. 26.

These notes, however, only indicate that Thompson took a particular negotiating posture.  Moreover, other notes indicate that GTS's counsel considered Thompson's position to be "weak"

---

[13]Solomon is now deceased and therefore was not deposed for this action.

and contain the outlines of a compromise on the Note similar to what was contained in the Severance Agreement.  See Pl.'s Mot. S.J. Ex. 7.

In fact, the evidence of the parties' negotiating positions undermines Thompson's argument.  As GTS was preparing to terminate him, Thompson's only defense to an unambiguously written, full-recourse Note was a supposed uncorroborated side agreement with Solomon.  Moreover, as GTS recognized at the time, Thompson's position that the Note would not have to be repaid was tantamount to an admission of securities fraud.  As CEO of GTS, Thompson had signed GTS's SEC filings, including GTS's Form 10-K for 1999, which stated explicitly that he had purchased securities "using the proceeds of a loan in the principal amount of $10 Million from [GTS]," and that the "loan" had a "maturity of six years."  Pl.'s Mot. S.J. Ex. 6.  Nowhere did the Form 10-K state, or give any indication, that the Note would not have to be repaid if GTS's stock declined in value, a condition that clearly would have had an impact on the Note's value as an asset and should have been disclosed.  As Raclin recognized at the time, if Thompson had held steadfast in his position that the Note did not have to be repaid, he could have faced potential liability for securities fraud.  See Pl.'s Mot. S.J. Ex. 7.

In light of the relative positions from which GTS and Thompson began their negotiations of the Severance Agreement, the

-26-

compromise that Thompson claims was reached, one that would have left him with absolutely no liability on the Note, is completely implausible.   Conversely, the compromise that the Trustees assert was reached, and the one consistent with the text of the Severance Agreement, makes complete sense.   Under the Severance Agreement, Thompson received some, but not complete, relief; the Note's due date was postponed to 2005, and Thompson would be forgiven for all of the interest through the maturity date, and could avoid paying some or all of the principal, if he performed his obligations under the Consulting and Investment Banking Agreements effectively.   Accordingly, the extrinsic evidence cited by both parties only reinforces the Trustees' claim and weakens Thompson's affirmative defense.

### b. The Parties' Actions Following the Severance Agreement.

Actions by both GTS and Thompson after they signed the Severance Agreement provide additional support for the Trustees' position that the Note remained enforceable against Thompson, and undermine Thompson's argument that the Severance Agreement released him from personal liability.   In April 2001, only four months after the Severance Agreement was signed, GTS made its 10-K filing for 2000, in which it continued to describe the Note as a "loan" of $10 million provided to Thompson to purchase stock. See Pl.'s Mot. S.J. Ex. 17.   The 10-K described the Consulting and Investment Banking Agreements, stated that the Severance

-27-

Agreement "amended" the terms of the loan, and made it clear that
the amended, interest-bearing loan was due on April 6, 2005.  Id.
Finally, GTS later sold the Note, and the right of repayment, to
GTS Holdings for $5.4 million.  All of these actions manifest a
clear, contemporaneous understanding that at least from the
perspective of GTS, the Note had value and was fully enforceable
against Thompson, consistent with the Trustees' position.

In addition, according to Thompson's accountant, Carl
Hildebrand, in late 2001, well after the Severance Agreement was
signed, Thompson contacted Hildebrand to inform him that GTS was
considering forgiving the Note, and to ask him about the relevant
tax implications if it did so.  Hildebrand Dep. 40-41.[14]
Hildebrand's uncontroverted testimony is evidence that even
Thompson understood that the Severance Agreement had not forgiven
his personal obligation under the Note; rather, even in late
2001, the matter was merely something GTS was considering.

### c. Deposition Testimony.

Finally, deposition testimony by attorneys and principals
refutes Thompson's position.  Raclin, GTS's former General

---

[14]Hildebrand responded with a memorandum opening with a
statement that the Note was "payable in a lump-sum payment in
2006," and describing the relevant issue as, "If the company
forgives the note . . . is this ordinary income to [Thompson] as
discharge of indebtedness income?"  Pl.'s Mot. S.J. Ex. 19
(emphasis added).  There is no evidence that Thompson ever told
Hildebrand that his personal obligation had already been
forgiven.

Counsel, who supervised the drafting of the Severance Agreement, Jed Brickner, its outside counsel, Amman, who succeeded Thompson as CEO, Robert Schriesheim, GTS's former CFO and a board member, and Arnold Dean, GTS's former Deputy General Counsel for securities filings, have all testified, unequivocally, that GTS never intended to release Thompson from his obligations under the Note. Indeed, Raclin testified that Paragraph 5 was put in the Severance Agreement specifically to make it clear that the Note was enforceable because of Thompson's claim that he did not have to repay it, see Raclin Dep. 71:1-7, and that the general release in Paragraph 9 was not intended to include the Note, see id. 121:21-123:7, 171:4-15. It is also noteworthy that Alvin Brown, Thompson's lawyer when the Severance Agreement was drafted, after being deposed for two and a half hours, see Tr. S.J. Hr'g 7:21-8:6, provided no testimony whatsoever regarding his understanding of the Severance Agreement.[15]

The most compelling extrinsic evidence in this action comes from Thompson himself, who effectively admitted in his deposition that the Severance Agreement did not relieve him of personal liability under the Note. In Thompson's own words,

---

[15]Brown testified that he "attempted to clarify in [his] discussions with [Raclin] and [Brickner] that the Note would not have to be repaid by Mr. Thompson." Brown Dep. 42:10-13. However, the record contains no testimony by Brown regarding his understanding of Paragraphs 5 and 9 of the Severance Agreement, and a number of questions to Brown were apparently objected to by the defendant on privilege grounds. See Tr. S.J. Hr'g 8:4-6.

The original agreement for the treatment of the note at the time of my departure was that rather than my being responsible for paying back the note, which was called for under the terms of the note at the time of my termination, that the substitute for my responsibility would be incorporated in two agreements, one of which was an Investment Banking Agreement and the other which was a Consulting Agreement.  The note was to have been . . . expunged by the value of the shares that were held in custody, the terms of the Investment Banking Agreement and the terms of the Consulting Agreement. If there were any overages or underages, if that occurred and when that occurred, that it <u>would be</u> the – the company's responsibility working with me to assure that the transaction expunged the note.  The note <u>would be forgiven</u>.

Thompson Dep. 24:12-25:7 (emphasis added).  Similarly, Thompson

testified,

[T]he understanding when I left the company was that . . . the credits for the note would come from three sources so that company [sic] could take the note off its books.  The first was whatever the value was of the Investment Banking Agreement . . . and it could have been the full amount or less, the actual shares themselves that were held, and the interest payments that would come from . . . a Consulting Agreement. . . . <u>It was also anticipated that any transaction that fell short of the 10 million that the company and I would work together to make sure that the purchasing party forgave the balance of those notes.</u>

<u>Id.</u> 114:6-115:2 (emphasis added).

What Thompson's testimony clearly establishes is that the Severance Agreement was not an agreement that forgave Thompson's debt or converted it to non-recourse.  Rather, it shows that he and GTS "anticipated" that they "would work together" in the future to ensure that any remaining balance of the Note "would be forgiven" if the total value of the Consulting and Investment

-30-

Banking Agreements, plus the value of Thompson's shares, was less than $10 million.  Apparently, the parties, as they did in 1999, hoped that GTS's stock would attain a value such that the company could be sold at a price that would allow the Note's balance to be significantly offset, and then anticipated working out any remaining differences.  But an anticipation is not a contract, and the parties had no contract to forgive Thompson's debt. Unfortunately, the parties' hopes were not realized, and GTS ultimately went bankrupt.  The Note's current owners, bankruptcy trustees, are fiduciaries who are under no obligation to "work together" with Thompson to forgive the Note.  Accordingly, even giving Thompson every benefit of the doubt, neither the intrinsic nor extrinsic evidence supports his position, and the overwhelming evidence, including Thompson's own testimony, supports the Trustees' position.

### 4. Failure of Consideration and Material Breach.

Thompson's remaining arguments merit little attention.  His claim that the Note is not enforceable for failure of consideration because he never actually received the shares of stock, and was never able to trade or sell them before they were cancelled when GTS went into bankruptcy, is meritless.  Thompson never took possession of the actual shares because they were pledged as security for the Note, in accordance with the terms of a Pledge and Security Agreement signed by the parties.  See

-31-

Def.'s Mot. S.J. Ex. 10 ¶¶ 2, 9.  The restrictions on Thompson's ability to trade or sell the shares were also part of this agreement.  See id. ¶ 7.  That Thompson had fewer rights to the shares than one who owns stock free and clear of a security interest does not mean that there was a failure of consideration. Thompson received value, albeit with certain restrictions, in exchange for his obligation to repay the Note.  Moreover, that the shares became almost worthless and were ultimately cancelled in bankruptcy is irrelevant.  If this argument prevailed, any purchaser of corporate stock that eventually became worthless could attempt to void the original purchase for failure of consideration.  That the shares ultimately became worthless does not make them retroactively worthless at the time Thompson purchased them.

Thompson also argues that the plaintiffs materially breached their obligations under the Consulting and Investment Banking Agreements and therefore cannot enforce the Note.  The alleged breaches occurred when GTS Holdings, and later the Trustees, failed to credit Thompson for his work under these agreements by reducing the amount of interest and principal owed on the Note.[16]

Although a party that materially breaches a contract cannot

---

[16]As evidence, Thompson cites the failure of GTS Holdings and the Trustees to send him "1099" tax forms for his earnings, as well as the Trustees' initial demand for $10 million plus interest, which ignored the offsets that Thompson had earned under the Consulting and Investment Banking Agreements.

later attempt to enforce it, see Horton v. Horton, 487 S.E.2d 200, 203 (Va. 1997), this doctrine does not bar the trustees from collecting on the Note.  First, the Note is separate and distinct from the Consulting and Investment Banking Agreements, and there is no evidence that the plaintiffs or their predecessors-in-interest failed to fulfill any of their obligations under the Note.  Second, there was no material breach of either the Consulting or Investment Banking Agreements.  A material breach is "a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract."  Id. at 204.  The mere failure of GTS Holdings and the Trustees to credit Thompson in their internal books, under a compensation arrangement where Thompson was not to receive any actual payments but only offsets to what he owed on the Note, would not "defeat[] an essential purpose of the contract."  The only possible damages Thompson has suffered are any expenses he has incurred to prove that he fulfilled his obligations under the Consulting and Investment Banking Agreements.  His remedy for such expenses would be damages, and not excuse from performance.  Moreover, the Trustees have since recognized that Thompson's liability should be reduced by $3.5 million, because a "strategic transaction" occurred pursuant to the Investment Banking Agreement, and that he owes no pre-default interest, pursuant to the Consulting Agreement, and

-33-

the Trustees therefore now seek only $6.5 million plus post-default interest.  Accordingly, the plaintiffs are not barred under the material breach doctrine from pursuing their claims under the Note.

### III. Motion to Dismiss Counterclaim for Indemnity.

Plaintiffs have moved to dismiss Thompson's counterclaim, in which he alleges that even if he is personally liable for the balance of the Note, the Trustees' claim is subject to a provision of his original Employment Agreement under which GTS agreed to indemnify him for certain claims concerning his purchase of the company's stock.

### A. Standard of Review.

To survive a Motion to Dismiss for Failure to State a Claim, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).  A party meets this burden "when [it] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  Thus, a complaint or counterclaim must raise "more than a sheer possibility" that the party is liable, and go beyond pleading facts that are "merely consistent with a [party's] liability."  Id.  When the pleading contains well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give

-34-

rise to an entitlement to relief." <u>Id.</u> at 1950.  On the other
hand, allegations that merely recite elements of a cause of
action are not assumed to be true.  <u>Id.</u> at 1949.  Ultimately,
"[d]etermining whether a complaint [or counterclaim] states a
plausible claim for relief . . . [is] a context-specific task
that requires the reviewing court to draw on its judicial
experience and common sense." <u>Id.</u> at 1950.

**B. Discussion.**

Thompson's indemnity counterclaim relies primarily on
Section 5(d)(ii) of his original Employment Agreement, which
references a separate contract to purchase $20 million in GTS
stock.  Referring to that separate contract, the Employment
Agreement, which is governed by Delaware law, stated:

> Such contract shall also provide that [GTS] shall agree
> to indemnify and hold [Thompson] harmless from all
> costs, charges and expenses . . . of any action, suit,
> proceeding or other claim (other than the Executive's
> income or other tax liability relating to his purchase
> or sale of the Purchase Stock) arising in connection
> with the sale by [GTS] to [Thompson] of the Purchased
> Stock, except to the extent such indemnity is
> prohibited by law.

Thompson argues that this provision applies to the Trustees'
effort to collect on the Note.

Under Delaware law, it is illegal for a company to
prospectively indemnify an employee against "an action by or in
the right of the corporation."  Del. Code Ann. tit. 8 § 145(a).
Similarly, Delaware law states that "no indemnification shall be

made in respect of any claim, issue or matter as to which [a
corporate officer, director, or employee] shall have been
adjudged liable to the corporation." Id. § 145(b).  Although the
prohibition in § 145(b) contains an exception allowing indemnity
if a court determines "in view of all the circumstances [that]
such person is fairly and reasonably entitled to indemnity," this
exception only applies if the defendant is sued "by reason of the
fact that the person is or was a director, officer, employee or
agent of the corporation."  When a corporate officer is sued for
a debt on a promissory note to the corporation, such a debt is a
personal debt and this exception does not apply.  See Stifel Fin.
Corp. v. Cochran, 809 A.2d 555, 562 (Del. 2002) (noting that "a
conclusion [allowing indemnity in such a case] would render the
officer's duty to perform his side of a contract in many ways
illusory").  Thus, the Employment Agreement, which explicitly
barred any indemnity prohibited by law, could not provide a basis
for indemnification of Thompson against claims on the Note by GTS
or its successors.

Moreover, Thompson's suggested reading of the indemnity
clause is simply not "plausible on its face." Iqbal, 129 S.Ct. at
1949.  The section of the Employment Agreement that contains the
indemnity provision, § 5(d)(ii), also explicitly references
Thompson's "full recourse promissory note."  Thompson's suggested
interpretation of the indemnity clause would render this

-36-

provision, and the Note, "illusory or meaningless," O'Brien, 785 A.2d at 287, and must therefore be rejected as implausible.[17]

Finally, Thompson has also cited Section 21 of the Severance Agreement, which indemnified him "for liability for claims or acts arising out [of] his services as a director or officer of [GTS]." This provision also does not apply to Thompson's debt under the Note because, as in Stifel,[18] Thompson's obligation to pay back the Note was a personal one and did not arise out of his work for GTS in an official capacity.

## IV. Conclusion.

For the above reasons, the plaintiffs' Motion for Summary Judgment and Motion to Dismiss Defendant's Indemnity Counterclaim and Corresponding Defenses will be granted, and the defendant's

---

[17]Coady v. Strategic Resources, Inc., 515 S.E.2d 273 (Va. 1999), a case cited by Thompson in which the Virginia Supreme Court appeared to give effect to a circular interpretation of an indemnity clause such as the one Thompson advocates, is not on point because the Employment Agreement is governed by Delaware, not Virginia, law, and because Coady concerned indemnity for attorney's fees, not for the entire underlying obligation.

Thompson also cites to a memorandum written by Raclin, expressing concern that the indemnity provision "could be read" to encompass the Note. Def.'s Opp. Mot. to Dismiss Ex. C. This memo is in no way dispositive of the provision's actual meaning. To the contrary, this memorandum reflects a concern by Raclin that a court might erroneously read the clause to include the Note.

[18]The Severance Agreement, like the Employment Agreement, is governed by Delaware law, and Stifel is therefore binding authority.

Motion for Summary Judgment will be denied, by an Order to be issued with this Memorandum Opinion.

Entered this 4th day of September, 2009.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge